**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**(NORTHERN DIVISION)**

RECEIVED

2010 SEP -9 A 10: 22

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| CITY OF GREENVILLE; CITY OF EVERGREEN; CITY OF GEORGIANA; TOWN OF MCKENZIE | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | CASE NO. CV- 2:10CU756-mLt ) ) |
| BP, PLC; BP EXPLORATION & PRODUCTION, INC.; BP PRODUCTS NORTH AMERICA, INC.; BP AMERICA, INC.; TRANSOCEAN, LTD.; TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.; TRANSOCEAN DEEPWATER, INC.; ANADARKO PETROLEUM CORPORATION; ANADARKO E&P COMPANY, LP; MITSUI & CO. (U.S.A.), INC.; MOEX OFFSHORE 2007, LLC; HALLIBURTON ENERGY SERVICES, INC.; CAMERON INTERNATIONAL CORPORATION f/k/a COOPER CAMERON CORPORATION; and M-I, L.L.C. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) JURY DEMAND |
| Defendants. | |

## COMPLAINT

## I. INTRODUCTION

1. The City of Greenville, the City of Evergreen, the City of Georgiana, and the Town of McKenzie ("Plaintiffs") bring this action against the defendants identified below ("Defendants"), and avers as follows:

2. This is an action to recover damages suffered by Plaintiffs as a result of the oil disaster that occurred from the explosion, fire aboard, and subsequent sinking of the oil rig Deepwater Horizon (hereinafter "Deepwater Horizon" or "Oil Rig") on April 20, 2010, at about 10:00 p.m. central time in the Gulf of Mexico (Latitude 28° 45.23' N; Longitude

88° 18.89' W) approximately 100 miles from the Alabama coast. For approximately 87 days following the sinking of the Oil Rig, an estimated 35,000 to 62,000 barrels per day of crude oil were released from the sinking rig, the oil well upon which the Deepwater Horizon was performing completion operations, and from the pipe connected to it (drill stack). The oil, as well as the dispersants used to clean the oil, made their way into the waters and onto the land of the State of Alabama. They have caused detrimental effects upon the Gulf of Mexico's and Alabama's marine environments, coastal environments, and estuarine areas. This marine oil and chemical release—the largest in the history of the United States—has caused and will continue to cause extensive economic damage to the Plaintiffs, including loss of tax and other revenues and increased costs for additional public services.

## II.   JURISDICTION

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 33 U.S.C. § 2717; and 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and because the requisite diversity of citizenship exists between Plaintiffs and Defendants.

4. Prosecution of this action in this district is proper under 28 U.S.C. § 1391(b)(2), 28 U.S.C. § 1391 (c), and 33 U.S.C. § 2717 as a substantial portion of the events or omissions giving rise to the claims asserted herein occurred in this district and/or a substantial part of the property at issue in this action is situated in this district.

## III.  PARTIES

5. The City of Greenville is a municipal corporation which is organized pursuant to the laws of the State of Alabama. Greenville contains gas stations, truck stops, restaurants, hotels,

stores and other transportation services serving Interstate 65 ("I-65"), United States Highway 31 ("US-31"), and Alabama Highway 10 ("AL-10").

6. The City of Evergreen is a municipal corporation which is organized pursuant to the laws of the State of Alabama. Evergreen contains gas stations, truck stops, restaurants, hotels, stores and other transportation services serving I-65, US-31, United States Highway 84 ("US-84"), and Alabama Highway 83 ("AL-83").

7. The City of Georgiana is a municipal corporation which is organized pursuant to the laws of the State of Alabama. Georgiana contains gas stations, truck stops, restaurants, hotels, stores and other transportation services serving I-65, US-31, and Alabama Highway 106 ("AL-106").

8. The Town of McKenzie is a municipal corporation which is organized pursuant to the laws of the State of Alabama. McKenzie contains gas stations, truck stops, restaurants, hotels, stores and other transportation services serving US-31 and Alabama Highway 55 ("AL-55").

9. Plaintiffs derive a significant amount of their tax revenue from the Gulf of Mexico's tourism industry and its tourist traffic to and from the Gulf coast. I-65 is a major corridor for visitors traveling to the Gulf coast. It starts in Mobile, Alabama and continues northward through Tennessee, Kentucky, and Indiana. It terminates in Gary, Indiana, which is southeast of Chicago, Illinois. The interstate travels through major cities such as Mobile, Montgomery, and Birmingham, Alabama; Nashville, Tennessee; and Indianapolis, Indiana.

10. US-31 is another major north-south passage through several states, including Alabama. US-31 begins in Spanish Fort, Alabama at the junction of U.S. Highway 90 with U.S.

Highway 98. It continues northward, merging in Athens, Alabama with I-65 for 14 miles, passing through Tennessee, Kentucky, Indiana, and ending in northern Michigan near Mackinaw City. It is an alternative north-south route to the interstate system, traveling through Montgomery and Birmingham, Alabama; Nashville, Tennessee; Louisville, Kentucky; and Indianapolis, Indiana.

11. I-65 and US-31 are two of the few continuous north-south routes running from northern States that lead directly to the Alabama and nearby Gulf coasts.

12. AL-10 connects eastern and western parts of the State of Alabama with the major north-south corridors of I-65 and US-31, beginning near Fort Gaines, Georgia and continuing through Troy, Alabama and Greenville, connecting with Mississippi Highway 19 to Meridian.

13. US-84 is an east-west United States highway, extending from the Atlantic coast of Georgia to Colorado. It is a major link to I-65, US-31, and AL-55, for several Alabama municipalities, including Dothan, Enterprise, Opp, Andalusia, Evergreen, and Grove Hill.

14. AL-83 travels from Midway, AL and surrounding municipalities southward to Evergreen, allowing travelers to connect with I-65 and US-31 as it travels in a diagonal direction from Montgomery, Alabama to the Gulf coast.

15. AL-106 is an east-west connection for Butler and Crenshaw counties to reach I-65 and US-31.

16. AL-55 is a north-south passage for the south-eastern section of Alabama, taking travelers from US-31 south towards the Alabama-Florida state line. At the state line, it connects with a Florida highway going directly to Fort Walton Beach and Destin, Florida.

17. Because of the drop in travelers to the Gulf coast due to the oil disaster, the Alabama Gulf Coast Convention and Visitors Bureau noted in June a 22.4% decline in taxable retail sales and a 34.6% decline in taxable lodging rentals. Plaintiffs have seen a similar substantial decline in tax revenue since and due to the oil disaster. Additionally, as a result of the oil disaster, Plaintiffs have seen an increase in demand and costs for economic, human, and social services. Plaintiffs' damages are more fully described below.

18. Defendants herein are:

   a. BP, PLC ("BP") is a foreign corporation doing business in the State of Alabama and within this district. BP is one of the world's largest oil companies.

   b. BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and within this district. All allegations and claims asserted herein against Defendant BP, PLC are incorporated by reference against BP Exploration and Production, Inc.

   c. BP Products North America, Inc. ("BP Products") is a Maryland corporation with its principal place of business in Baltimore, Maryland but doing business in the State of Alabama and within this district. All allegations and claims asserted herein against Defendant BP, PLC are incorporated by reference against BP Products North America, Inc.

   d. BP America, Inc. ("BP America") is a Delaware corporation with its principal place of business in Chicago, Illinois, but doing business in the State of Alabama and

within this district. All allegations and claims asserted against BP, PLC are incorporated by reference against BP America, Inc.

e. Defendants BP Exploration and Production, Inc., BP Products North America, Inc., and BP America, Inc. are wholly owned subsidiaries of the global parent corporation, BP, and they shall be referred to herein collectively as "BP."

f. Transocean Ltd. ("Transocean") is a Swiss corporation doing business in the State of Alabama. Transocean is the world's largest offshore drilling contractor and leading provider of drilling management services worldwide.

g. Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama. All allegations and claims asserted herein against Defendant Transocean Ltd. are incorporated by reference against Transocean Offshore Deepwater Drilling, Inc.

h. Transocean Deepwater, Inc. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama. All allegations and claims asserted herein against Defendant Transocean Ltd. are incorporated by reference against Transocean Deepwater, Inc.

i. Defendants Transocean Offshore Deepwater Drilling, Inc. and Transocean Deepwater, Inc. are wholly owned subsidiaries of the global parent corporation, Transocean Ltd., and they shall be referred to herein collectively as "Transocean."

j. Anadarko Petroleum Corporation ("Anadarko Petroleum") is a Delaware corporation with its principal place of business in The Woodlands, Texas, but doing business in the State of Alabama and within this district.

k. Anadarko E&P Company LP ("Anadarko E&P") is a Delaware corporation with its principal place of business in The Woodlands, Texas, but doing business in the State of Alabama and within this district. All allegations and claims asserted herein against Defendant Anadarko Petroleum Corporation are incorporated by reference against Anadarko E&P Company LP.

l. Mitsui & Co. (U.S.A.), Inc. ("Mitsui") is a New York corporation with its principal place of business in New York, New York, but doing business in the State of Alabama and within this district.

m. MOEX Offshore 2007, LLC is a Delaware corporation with its principal place of business in Houston, Texas, but is doing business in the State of Alabama. All allegations and claims asserted herein against Defendant Mitsui & Co. (U.S.A.), Inc. are incorporated by reference against MOEX Offshore 2007, LLC.

n. MOEX Offshore 2007, LLC is a wholly owned subsidiary of the parent corporation Mitsui & Co. (U.S.A.), Inc., and they shall be referred to herein collectively as "Mitsui."

o. Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with its principal place in Duncan, Oklahoma but doing business in the State of Alabama and within this district. Halliburton is one of the world's largest providers of products and services to the energy industry and was engaged in cementing operations of the Oil Well and well cap and, upon information and belief, improperly and negligently performed these duties, increasing pressure at the Oil Well and causing and/or contributing to the fire, explosion, and resulting oil disaster.

p.  Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and within this district. Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil and gas and process industries. Cameron manufactured and/or supplied the *Deepwater Horizon's* blowout preventer ("BOP") valves that failed to activate at the time of the explosion, which should have prevented the oil disaster. Upon information and belief, the BOP's were defective because they failed to operate as intended, among other reasons. As such, Cameron is liable to Plaintiffs for supplying this defective product in addition to being liable for its negligence.

q.  M-I, L.L.C. is a Texas corporation with its principal place of business in Houston, Texas, but doing business in the State of Alabama and within this district. M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation, and drilling waste management products and services. M-I provided the drilling fluids for the *Deepwater Horizon* at the time of the explosion.

## IV.   FACTUAL ASSERTIONS

19. BP, Anadarko Petroleum, and Mitsui are the holders of a lease granted by the Minerals Management Service for the drilling of oil and performance of oil-production-related operations at the site of the oil release, and on April 20, 2010 operated the oil well that is the source of the oil release.

20. Upon information and belief, at all times relevant to this Complaint, BP was authorized to conduct offshore drilling operations using the semi-submersible drilling rig *Deepwater Horizon* at Macondo prospect MC252 in the Gulf of Mexico.

21. The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001 and owned by Transocean. Transocean, or its predecessors, designed the *Deepwater Horizon.*

22. Upon information and belief, Cameron manufactured and/or supplied the Deepwater Horizon's blow-out-preventers ("BOPs"), a series of valves and seals that failed to control pressure and prevent the explosion and resulting release of oil. The BOPs were defective because they failed to operate as intended.

23. Halliburton was engaged in cementing operations of the well and well cap and, upon information and belief, improperly and negligently performed these duties, increasing the pressure at the well and contributing to the fire, explosion, and resulting oil release.

24. At all times material hereto, the Deepwater Horizon was manned, possessed, managed, controlled, chartered and/or operated, directly or through agents, by BP, Anadarko Petroleum, and Mitsui.

25. From April 20 through April 22, 2010, the *Deepwater Horizon* exploded, burned, and sank into the Gulf of Mexico within approximately 100 miles of the Alabama coast. The explosion occurred during the course of cementing work being performed to create a cement seal to plug the Oil Well as part of the final phases of converting the Oil Well from an exploratory well into a production well. Cementing is delicate work that carries with it a risk of a blowout, or the uncontrolled release of oil from the well. It is believed the explosion on the *Deepwater Horizon* was a blowout related to the cementing work.

However, an investigation is still ongoing, and there may be other causes of the disaster that are not yet ascertainable by the Plaintiffs.

26. As the *Deepwater Horizon* sank, it broke off the long riser pipe carrying oil to the surface of the seafloor, leaving the pipe gushing oil out of its open end as well as through two breaks along its length. Although the wellhead was equipped with an emergency blowout preventer valve designed to seal off the well in the event of a sudden pressure release exactly like the one that occurred during the *Deepwater Horizon* blowout, the BOP failed to activate and seal the wellhead as it should have, leaving the wellhead spewing oil into the ocean at a rate of up to 2.5 million gallons of oil per day—a rate that is equal to the *Exxon Valdez* spill about every four days.

27. At the time of this filing, it is currently estimated that approximately 35,000 to 60,000 barrels of oil were released each day into the waters of the Gulf of Mexico from the Oil Rig over a period of approximately 87 days. This oil, as well as other materials and substances including chemical dispersants used in an attempt to clean up the oil, have polluted and damaged the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Gulf of Mexico. Despite mobilization of private and public efforts, the oil, dispersants, and other materials and substances have not been cleaned up and continue to migrate into the waters and onto the shores of the states of Alabama, Mississippi, Louisiana, Florida, and Texas. As a result, the oil, dispersants, and other materials and substances discharged by the Defendants into the Gulf of Mexico is currently now damaging and will continue to damage for generations to come, the waters, property,

estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of these areas.

28. Tourists regularly visited the Gulf of Mexico to enjoy its beaches, swimming, fishing, bird and wildlife watching, water sports, and other recreational activities. According to the U.S. Environmental Protection Agency's General Facts about the Gulf of Mexico, "The Gulf of Mexico's shores and beaches, offering an ideal location for swimming, sun, and all water sports, supports a $20 billion tourist industry." The summer and warmer months have been the high season for tourists to the Gulf of Mexico. A large percentage of these visitors drive south from more northern areas. Especially for tourists visiting the coasts of Alabama, Mississippi, and northwest Florida, I-65 and US-31 are major routes, including the sections that pass through Greenville, Evergreen, Georgiana, and McKenzie. Plaintiffs' gas stations, truck stops, restaurants, hotels, stores and other transportation services have served I-65 and US-31 travelers to the Gulf of Mexico, as well as those highways connecting travelers to those major thoroughfares.

29. Due to the oil disaster and the attempted clean-up involving toxic chemicals, tourists have cancelled their plans to visit locations along the Gulf of Mexico. In fact, BP has already admitted that the disaster has negatively impacted demand for Gulf properties. This decreased tourism to the Gulf has resulted in less traffic along I-65, US-31, and the connecting highways; less revenue for Plaintiffs' businesses; and substantially less tax revenue for the municipalities of Greenville, Evergreen, Georgiana, and McKenzie.

30. The fire and explosion on the *Deepwater Horizon*, its sinking, and the resulting oil disaster were caused by the combined and concurring negligence or wantonness of Defendants, which renders them liable jointly and severally to Plaintiffs for all damages.

31. The injuries and damages suffered by Plaintiffs were caused by Defendants' negligent, willful, and/or wanton failure to adhere to recognized industry standards of care and safety practices.

32. All Defendants knew of the dangers associated with the deep water drilling operations being conducted on the *Deepwater Horizon* and negligently, willfully, and wantonly failed to take appropriate measures to prevent damage to Plaintiffs.

33. According to reports and upon information and belief, Defendants acted or failed to act in ways that greatly heightened the risk of a "blow-out" disaster and catastrophic oil release. The Defendants knew they were operating in a dangerous formation in which extra safety precautions were required, not fewer. The Defendants' conduct with respect to the *Deepwater Horizon* and Oil Well illustrates their scheme to maximize profits and ignore dangerous risks posed to human health and property. Upon information and belief, these non-exclusive examples include:

   a. Utilizing a defective well casing that was prone to fail when under heavy pressure;

   b. Failing to observe dangerous and recurring problems with highly flammable gaseous compounds, and instituting risky cementing and drilling procedures hours before the *Deepwater Horizon* explosion;

   c. Failing to institute common industry protective measures necessary to detect the buildup of highly flammable gaseous compounds before and during the cementing process;

   d. Accelerating drilling operations in an effort to save money and pressuring employees hours before the *Deepwater Horizon* explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf's crust;

   e. Continuing to operate the Oil Well without repairing the blowout preventer's annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers' protective measures against a blowout;

f.   Failing to disclose or correct the fact that the battery on the blowout preventer was weak and one of its control pods was broken;

g.   Consciously electing not to install an acoustically activated remote-control shut-off valve;

h.   Failing to install a deepwater valve to be placed nearly 200 feet under the sea floor; and

i.   Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put into place in order to speed up the drilling process thereby creating high pressure instability in the well.

34. According to Representative Henry Waxman (D-Calif.), BP told the House Energy and Commerce Subcommittee on Oversight that the Oil Well that exploded had failed a key pressure test hours before the April 20, 2010 explosion. "Significant pressure discrepancies were observed in at least two of these tests, which were conducted just hours before the explosion," according to Rep. Waxman, citing documents his committee received from BP. Despite these worrisome pressure readings, Waxman stated "it appears the companies did not suspend operations, and now 11 workers are dead and the Gulf faces an environmental catastrophe." Some or all of the Defendants have subsequently admitted responsibility for the oil disaster.

35. The Defendants' initial response to the *Deepwater Horizon* disaster was lackluster and only intensified the damage. While the Defendants struggled to develop containment systems on the spot, thousands of barrels of crude oil were gushing into the Gulf of Mexico each day. On May 10, 2010, BP Chief Operating Officer Doug Suttles for the first time publicly admitted that it was woefully unprepared to mitigate the damage of the *Deepwater Horizon* disaster due to its location. Suttles stated, "There's a lot of techniques available to us. The challenge with all of them is, as you said, they haven't been done in 5,000 feet of water."

36. Moreover, the Defendants also failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the *Deepwater Horizon* explosion, and misrepresented their capability to safely conduct offshore drilling operations and contain oil releases that might occur in connection with such operations. After the oil disaster began, BP Chief Executive Tony Hayward informed that it was "an entirely fair criticism" to say they had not been fully prepared for a deepwater oil disaster. He said "What is undoubtedly true is that we did not have the tools you would want in your tool-kit."

37. However, upon information and belief, on or about early 2009 BP submitted a paper to the Minerals Management Service in which it stated "[i]n the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which addresses available equipment and personnel, techniques for containment and recovery and removal of the oil spill."

38. After the explosion, Defendants attempted to downplay and conceal the severity of the oil disaster. Their original estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual amount pouring into the Gulf of Mexico each day. The Defendants then raised their estimate to 5,000 barrels per day — which again paled in comparison to the currently estimated oil flow of 35,000 to 62,000 barrels of oil per day. Moreover, Defendants were slow and incomplete, if not dishonest, in their announcements and warnings to the Plaintiffs and their citizens and businesses.

39. The Defendants were negligent and wanton in their attempts to clean-up oil gushed into and onto the Gulf coast's waters and shores, including but not limited to, Defendants' choice of a highly toxic chemical used to disperse the oil in the ocean.

## V.    DAMAGES TO PLAINTIFFS

40. Defendants have yet to clean up the millions of gallons of oil, dispersants, and other materials and substances discharged into and onto the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Gulf of Mexico, and the ultimate amount of damages incurred by Plaintiffs as a result of the *Deepwater Horizon* oil disaster is not yet ascertainable and shall be established according to the proof presented at the trial of this matter.  However, damages incurred to date include, but are not limited to the following:

   a.  Past, present, and future lost revenues from taxes, royalties, rents, fees, or net profit shares;

   b.  Past, present, and future costs expended by the Plaintiffs for providing increased or additional public services to address the oil disaster's economic effects on Plaintiffs, including increased administrative costs for economic, human, and social services.

   c.  Past, present, and future damages associated with the long-term stigma of the oil disaster, including the loss of property, taxes, revenues, and other income.

41. The Plaintiffs reserve the right to amend this Complaint once additional information regarding the full extent of Plaintiffs' damages becomes available.

## VI.   COUNT I – NEGLIGENCE AND/OR WANTONNESS

42. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if copied herein.

43. All Defendants owed a duty to the Plaintiffs to exercise reasonable care with respect to the construction, operation, inspection, training of personnel, repair and maintenance of the *Deepwater Horizon* and oil well; with respect to the disaster's containment and prevention planning prior to the disaster; with respect to the containment and prevention efforts following the initial oil disaster; and with respect to complying with federal laws and regulations governing their operations.

44. Defendants had a heightened duty of care to Plaintiffs because of the great danger and environmental concerns associated with the drilling of oil in the ocean.

45. Defendants, directly or through agents, breached their legal duty to Plaintiffs by failing to exercise reasonable care and were negligent, grossly negligent, and/or acting with reckless, willful, and wanton disregard for the Plaintiffs, in the construction, operation, inspection, training of personnel, repair and maintenance of the *Deepwater Horizon* and the oil well, in planning and implementing oil containment and prevention activities before and after the oil disaster, and in failing to comply with federal laws and regulations.

46. The fire, explosion, and resulting oil release were caused by the concurrent negligence, gross negligence, recklessness, willfulness, and wantonness of the Defendants.

47. Upon information and belief, Plaintiffs aver that the fire, explosion, and resulting oil release was caused by the joint negligence and wantonness of the Defendants in the following nonexclusive particulars:

a. Failing to properly operate the *Deepwater Horizon* and oil well;

b. Operating the *Deepwater Horizon* and oil well in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in the oil release;

c. Failing to properly inspect the Deepwater Horizon and oil well to assure that its equipment and personnel were fit for their intended purpose;

d. Failing to install a remote control acoustic switch to prevent the discharge of crude oil into the Gulf of Mexico;

e. Acting in a careless and negligent manner without due regard for the safety of others;

f. Failing to promulgate, implement, follow, and enforce procedures, rules and regulations pertaining to the safe operations of the *Deepwater Horizon* and oil well which, if they had been so promulgated, implemented, followed and enforced, would have averted the fire, explosion, sinking, and oil release;

g. Operating the *Deepwater Horizon* and oil well with untrained, poorly trained, and/or unlicensed personnel;

h. Inadequate and negligent training and/or hiring of personnel;

i. Failing to take appropriate action to avoid and/or mitigate the accident;

j. Negligent implementation of policies and/or procedures to safely conduct offshore operations in the Gulf of Mexico;

k. Failing to ascertain that the *Deepwater Horizon*, oil well and associated equipment were free from defects and/or in proper working order;

l. Failing to properly design the *Deepwater Horizon* and oil well;

m. Failing to take reasonable precautions to prevent and timely warn of the failure of the oil well or drilling rig;

n. Failing to timely bring the oil release under control;

o. Failing to provide appropriate accident preventive equipment;

p. Failing to undertake required tests and measurements of the well and to observe or respond to measuring devices that indicated excessive pressures in the well;

q. Failing to react to danger signs of catastrophic oil well or drilling rig failure;

r. Using defective BOPs that were improperly installed, maintained, and/or operated;

s. Conducting well and well cap cementing operations improperly;

t. Failing to comply with federal laws and regulations regarding disclosure of response capabilities to oil spills and required oil spill preparedness; failure to prepare an adequate oil spill response plan; and failure to marshal sufficient resources to adequately respond to the oil release and protect the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Gulf of Mexico;

u. Failing to timely and adequately contain and remove oil from Gulf waters and adjoining land;

v. Failing to use BOPs appropriate for this drilling operation, and failing to test the BOPs used;

w. Failing to follow plans and specifications applicable to the design and construction of the oil well and its components;

x.  Failing to use safety devices adequate to arrest the flow of oil in the event of catastrophic failure of the well or drilling rig;

y.  Concealing or misrepresenting the nature, size and extent of the oil disaster;

z.  Using dangerous chemical dispersants of an incorrect nature, type, and amount;

aa. Acting in a manner that justifies imposition of punitive damages; and

bb. Such other acts of negligence and omissions as will be shown at the trial of this matter.

48. Defendants knew or should have known that their negligent, willful, wanton and/or reckless conduct would foreseeably result in the disaster, causing past, present, and future damages to the waters, property, estuaries, seabed, animals, plants, beaches, shorelines, coastlines, islands, marshlands, and other natural and economic resources of the Gulf of Mexico, which in turn causes past, present, and future damages to the tax base and economic resources of the Plaintiffs.

49. The injuries to Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

50. In addition, the fire, explosion, sinking and the resulting oil spill would not have occurred had the Defendants exercised the high degree of care imposed on them and Plaintiffs, therefore, pleads the doctrine of *res ipsa loquitur.*

51. As a direct and proximate result of the combining and concurring negligence and wantonness of all Defendants, Plaintiffs have been and will continue to be damaged, including but not limited to damage to Plaintiffs' loss of tax and other revenues and direct and indirect costs associated with additional necessary public services.

52. Plaintiffs demand judgment against all Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined by a struck jury.

**VII.   COUNT II- NEGLIGENCE *PER SE***

53. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if stated herein.

54. At all times material hereto, Defendants were negligent *per se* by failing to comply with Federal laws and statutory standards intended to protect and benefit the Plaintiffs.

55. Statutes violated include, but are not limited to, the United States Refuse Act of 1899 (33 U.S.C. §407), which prohibits all industrial discharges into bodies of water and the Clean Water Act (33 U.S.C. §1251 et seq.) which bans the discharge of several toxic chemicals found in oil.

56. As a direct and proximate result of their negligence *per se*, Defendants are liable for the fire, explosion and release of oil, causing injuries and damages to Plaintiffs.

**VIII.   COUNT III- DAMAGES UNDER THE FEDERAL OIL POLLUTION ACT OF 1990**

57. Plaintiffs repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if stated herein.

58. The Federal Oil Pollution Act of 1990 imposes liability upon "each responsible party for a vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines . . . for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a).

59. The U.S. Coast Guard has designated BP and Transocean as responsible parties under the Federal Oil Pollution Act and may designate other Defendants as responsible parties in the future.

60. By virtue of Defendants' gross negligence or willful misconduct with respect to the acts and omissions alleged in this Complaint, pursuant to 33 U.S.C. § 2702(b), all responsible parties under the Federal Oil Pollution Act are liable for the following past, present, and future expenses incurred by or damages to a political subdivision of a State:

    a. Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or loss of real property or personal property;

    b. Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property or personal property;

    c. Damages for net costs of providing increased or additional public services during or after removal activities, including protection from fire, safety, or health hazards, caused by the discharge of the oil;

61. By virtue of the acts and omissions alleged in this Complaint, Defendants are jointly and severally liable for the aforementioned damages under the Federal Oil Pollution Act.

## IX. <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally as follows:

    a. Economic and compensatory damages in amounts to be determined at trial;

    b. Punitive damages;

    c. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

    d. Attorney's fees and costs of litigation;

e. Such other and further relief available under all applicable state and federal laws and any relief the court deems just and appropriate; and

f. A trial by jury as to all Defendants and on all claims.

Respectfully submitted by,

Jere L. Beasley (ASB-1981-A35J)
Rhon E. Jones (ASB-7747-E52R)
David B. Byrne, III (ASB-2198-N77D)
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
(334) 269-2343
(334) 954-7555 (facsimile)

Paul Richard Hartley (ASB- 4373-Y75P)
HARTLEY & HICKMAN
P.O. Box 583
Greenville, AL 36037-0583
(334) 382-6618
(334) 382-5183 (facsimile)

Dated: September 8, 2010

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues and causes of action stated herein.

Respectfully submitted by,

Jere L. Beasley (ASB-1981-A35J)
Rhon E. Jones (ASB-7747-E52R)
David B. Byrne, III (ASB-2198-N77D)
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
(334) 269-2343
(334) 954-7555 (facsimile)

Paul Richard Hartley (ASB- 4373-Y75P)
HARTLEY & HICKMAN
P.O. Box 583
Greenville, AL 36037-0583
(334) 382-6618
(334) 382-5183 (facsímile)

DUPLICATE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602015447
Cashier ID: kruffin
Transaction Date: 09/09/2010
Payer Name: BEASLEY ALLEN CROW METHVIN
-----------------------------------
CIVIL FILING FEE
 For: BEASLEY ALLEN CROW METHVIN
 Case/Party: D-ALM-2-10-CV-000756-001
 Amount:      $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 208099
 Amt Tendered: $350.00
-----------------------------------
 Total Due:      $350.00
 Total Tendered: $350.00
 Change Amt:     $0.00

2:10-CV-756-MHT

City of Greenville, et al v. BP,
PLC et al